# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### April 12, 2011 Session

## ANDRE BALDWIN v. STATE OF TENNESSEE

**Appeal from the Shelby County Criminal Court**
**No. 00-13691     John T. Fowlkes, Jr., Judge**

---

**No. W2010-00948-CCA-R3-PC  - Filed July 19, 2011**

---

The Petitioner, Andre Baldwin, appeals the Shelby County Criminal Court's denial of post-conviction relief from his conviction for first degree murder, for which he is serving a life sentence. The Petitioner contends that he did not receive the effective assistance of counsel. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J, delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT W. WEDEMEYER, JJ., joined.

Michael R. Working, Memphis, Tennessee, for the appellant, Andre Baldwin.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Rachel Newton and Alexia Fulgham, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The facts of the Petitioner's case were stated by this court on direct appeal:

> Melissa Williams was married to the victim, Dewayne Williams. Ms. Williams testified that she and her husband had just gotten home at about 4:30 p.m. on January 14, 2000. They got out of their car and started walking toward their apartment when the Defendant approached them, telling the victim, "I need to holler at you a minute." The victim responded, "man, don't approach me in front of my wife," and told Ms. Williams to go on into the apartment; she continued walking in that direction.

She heard the Defendant and the victim talking, but did not understand what they were saying until she heard the Defendant say, "Hey, man, you going to make me catch a murder charge." Upon hearing that, Ms. Williams turned around and saw the Defendant with a gun in his hand. According to Ms. Williams, the Defendant fired a shot into the ground. The victim turned to run, and the Defendant then shot the victim in the back of the leg. As her husband continued to run, Ms. Williams ran into her apartment to call the police. Ms. Williams heard a total of "several" shots fired over a short period of time. When she ran back outside, she found her husband lying face down on the pavement in front of the dumpster.

On cross-examination, Ms. Williams explained that her husband had told her earlier in the day that he and the Defendant had "got into it" because the Defendant had been "spreading a lie that could get somebody hurt." According to the victim, this rumor was that the victim was involved with someone else's girlfriend.

Nakeama Gregory was in the Williams' apartment when the shooting occurred. She testified that she saw the Defendant approach the victim and Ms. Williams and heard him call, "Dewayne." The victim stopped and turned around; Ms. Williams kept walking toward the apartment. As Ms. Williams was entering the door, Ms. Gregory heard a gunshot. She looked out and saw the Defendant pointing a gun toward the victim. She testified that she saw the victim "rushing towards [the Defendant], like he was trying to keep him from shooting again. And we heard another gunshot." At the second gunshot, Ms. Gregory explained, the victim "flinched and he looked down towards hi[m]self." During this time, she and others in the apartment were trying to keep Ms. Williams inside. Ms. Gregory stated that the victim "looked as if he was hurt. And he turned around, like he was going to run." When she next saw the victim, he was lying down in front of the dumpster. According to Ms. Gregory, the Defendant was standing at his side; the Defendant then shot "straight down" and ran off.

On cross-examination, Ms. Gregory stated that she heard a gunshot while the Defendant was standing over the victim, but was "not for sure how he aimed the gun." She stated that she heard a total of three gunshots, and that the Defendant and the victim had been "inches" apart from each other when the second shot was fired.

Terrance Bean was in a nearby apartment on the afternoon in question, playing cards with several other people. He testified that the Defendant walked in and stated that he was "tired of [m------------ f------] with him." The Defendant was pacing the floor and looking out of the window. Mr. Bean saw a gun on the Defendant and told the Defendant that he didn't know what he was preparing to do, but "don't catch no charge." The Defendant was with the group for about ten minutes and then left.

After the Defendant left, Mr. Bean heard his brother say, "Fight!" Mr. Bean ran to the window and saw the Defendant and the victim. Mr. Bean testified that the victim had the Defendant "jacked up." According to Mr. Bean, "[the victim] pushed [the Defendant] off and [the Defendant] turned around and fired one shot in the air. When he turned back around, it was like [the victim] was coming towards him and he started shooting again." Mr. Bean saw the victim run, slip and fall. Mr. Bean also saw the Defendant run away. Mr. Bean told the police that he saw the Defendant shoot the victim after the victim had fallen, but stated at trial, "But, you know, it happened so fast I really don't know."

On cross-examination, Mr. Bean retreated further, stating, "I did see [the Defendant] shooting but, you know, I don't know if [the victim] was on the ground or not when [the Defendant] still was shooting or whatever, I don't know." Mr. Bean explained that being "jacked up" was the equivalent of being roughed up. Mr. Bean stated that the victim was bigger than the Defendant. When the victim raised the Defendant up and pushed him off, the Defendant fired a single shot into the air. The Defendant was backing up so fast that he almost fell down. It looked as though the Defendant was trying to get away

-3-

from the victim. Mr. Bean stated that approximately five shots were fired. According to Mr. Bean, after the first shot, "When [the Defendant] turned around, [the victim] was coming towards him and that's when [the Defendant] start just shooting."

On redirect, Mr. Bean acknowledged that, in his statement to the police, he said that the Defendant shot about three times, and the victim looked like he was trying to run, but fell beside the dumpster, at which point the Defendant fired two more shots at the victim.

Martha White was in the apartment with Mr. Bean when the Defendant came in. She testified that he looked "upset," "hyped," "jumpy," and was pacing the floor. The Defendant said that he was "tired of these [m------------] messing with him." She saw a gun in the Defendant's waistband.

After the Defendant left, she looked out the window and saw the Defendant and the victim facing each other a few inches apart. She testified, "then [the Defendant] turned around and shot at-shot the gun one time." At this point, the Defendant's back was to the victim. The Defendant then turned back around, the victim grabbed the Defendant's jacket, "[a]nd [the Defendant] start shooting." Ms. White heard the second shot while the gun was pointed toward the victim. The victim went toward the dumpster, and then returned. The Defendant started shooting again in the victim's direction as the victim was coming toward him. The victim then ran back around the dumpster and collapsed. The Defendant got in his car and left.

On cross-examination, Ms. White acknowledged having told the police that the Defendant had said that he was "tired of these [m-------------] putting their hands on me." She testified that this was an accurate reflection of what the Defendant had actually said. She explained that "putting their hands on" is the equivalent of hitting.

Sharon Furlong was in an upstairs apartment at the time of the shooting. She testified that she heard a single shot, followed by a pause, followed by three to five more shots. She

stated that, after she heard the first shot, she went to the window and looked out. She testified, "And I seen two men standing beside-near the dumpster. And they were facing each other. And there was three, four, maybe five more shots." She continued, "The person that got shot, I seen him grab himself and he stumbled back a little bit." She went outside and saw the victim lying face down on the ground.

Cathy Furlong, Sharon's mother, was with her daughter at the time of the shooting. They heard what they thought was a gunshot and went to the window to look out. Ms. Furlong testified, "We observed two men standing by the dumpster. We heard, like, three more shots. And then we-I proceeded to go outside and the man [who had been shooting] ran past me." She saw the victim lying face down on the ground.

Dr. Cynthia Gardner performed the autopsy on Dewayne Williams. She testified that the victim suffered two gunshot wounds. One of the wounds was to the victim's left thigh. The bullet entered the outside left rear thigh and exited the left inner thigh, causing no life-threatening injury. The other bullet entered the victim's left back in the shoulder area and traveled through the victim's left lung, aorta, pulmonary artery and right lung. The bullet exited the victim's right front chest just above his nipple. This bullet was fired from a distance of more than two feet. Dr. Gardner testified that she was unable to determine which bullet was fired first.

Dr. Gardner explained that the victim would probably have had about fifteen seconds of consciousness remaining after being shot in the chest. Injuries to the victim's face and hands indicated that he fell forward to the pavement in an unchecked manner, as though he had already lost consciousness. The victim's injuries justified an inference that he did not move after he fell. The angle of the bullet wound to the victim's chest indicated that the only way he could have been shot while lying on the ground was if he were lying with his left side up.

Officer Douglas Barnes reported to the crime scene. There, he found a bullet hole in the ground near the area where

the victim's car was parked. Officers recovered a bullet from this hole. The victim's car appeared to have been splashed with dirt and debris caused by this bullet hitting the ground. Another bullet was found when officers turned the victim's body over. Officer Barnes testified that "there was a bullet lying between [the victim's] clothing and his body that fell out. . . . A spent bullet, actual bullet."

Officer Dale Hensley also responded to the crime scene. There, officers looked for bullet strikes and other bullets around the body, but found none.

The Defendant turned himself into the police several days after the shooting, and Sergeant Daniel L. Barham took the Defendant's statement. After their initial conversation, Sgt. Barham had the Defendant repeat his statement while it was transcribed. The Defendant subsequently reviewed and signed this written statement, and a copy of it was provided to the jury. In this statement, the Defendant described the shooting and the events that led up to it as follows:

At about 4 o'clock [the victim] pulled up on the side of my car that was parked in front of [the Defendant's girlfriend's] house on Longmont. I rolled my window down to see what he wanted and he said did I tell JJ he (Dewayne) was messing with his girlfriend. Dewayne said that the stuff could have got back to my wife and I said something like why do y'all always come to me, why y'all always bring this to me. He kept asking me did I tell JJ that and I said yes I did tell JJ that. So he said well it could have got back to my wife and all this and he started talking crazy saying I will [f—] you up, I will [f—] you up and he walked around the car and pulled [the Defendant's girlfriend] out the car and then pulled me out the car and he got up some spit and spit in my face, jacked me over the door of my car and put me over the hood of my car and kept saying he would [f—] me up, he would [f—] me up and then he left. So I left and went up to Dale house and I sat down for a minute and I paced around and then I left and went to Hilldale and I went into Squeaky house and I was pacing around and I said I'm tired of folks

-6-

messing with me, I don't know why people always do me like this.

That went on for about 2 or 3 minutes I think and then Dewayne and his wife pulled up and I walked over to him and I asked Dewayne can we talk. Dewayne stepped on my toe and then he said you ain't had enough, grabbed me by my arm, like pulling me over to the car and he jacked me up and he was like get your hands out your pocket. He had me jacked all up and I said man I just come over here to talk to you, that's all I come over here to do, to talk to you. I got away cause I kind of turned my back a little bit and I pulled the pistol out and I shot the pistol in the air and I said I come to talk to you how come you doing me like that, how come you treat me like a pussy? At that time I saw him run at me and I pointed down at his leg to shoot him in his leg and he kept coming so I kept shooting at his leg and I got scared and kept shooting at his leg. After that I just left and went and got in my car. I went to Timberlake. I parked my car on Hawkins Mill Road. I walked down to Dale house. I paced around for a while. I called a ride and Mark Brooks picked me up, took me over Toya Sanders house and that's where I stayed for about 4 or 5 days and I called to y'all office and turned myself in.

Elsewhere in his statement, the Defendant explained that he had purchased the gun about a week earlier, and gave it to someone to hide after the shooting. The gun was subsequently stolen from its hiding place and was not recovered during the investigation. The Defendant stated, "My intentions were to talk to [the victim] like a man, not to shoot him. The gun was just for my protection."

Sgt. Barham testified that, during their initial conversation, the Defendant told him that "while the victim was down, he [the Defendant] walked over on top of him and was still shooting." Sgt. Barham admitted that this conversation was not recorded in any fashion, and further admitted that he did not question the Defendant about this detail during the subsequent transcribed statement.

-7-

Tameka Gaither testified that she was the Defendant's girlfriend in January 2000. On the afternoon of the shooting, she was sitting in the car with him in front of her mother's house on Longmont. She stated that, while they were sitting there, the victim pulled up in a car and got out, coming over to the driver's side of their car where the Defendant was sitting. The victim started saying "mean words" to the Defendant. The victim tried to grab the Defendant out of the car, but the driver's door would not open. The victim then came over to the passenger side and grabbed Ms. Gaither's arm, trying to pull her out of the car. The Defendant told the victim to stop pulling on her. The victim responded, "[N-----], I'll pull on you." Ms. Gaither then got out of the car, and the victim reached in and pulled the Defendant out. According to Ms. Gaither, the victim then "slammed" the Defendant against the car, hitting him and spitting on him. The Defendant did not fight back, and the victim eventually left. Ms. Gaither testified that the victim was bigger than the Defendant.

After this altercation, the Defendant told Ms. Gaither that he would be back, and got in his car and left. Ms. Gaither stated that the Defendant had tears in his eyes and was "scared and upset." She did not see him again that day.

On cross-examination, Ms. Gaither explained that other people had witnessed the episode, and that the Defendant had therefore been shamed.

The Defendant testified in his own defense. He explained that he had grown up and gone to school in Memphis, dropping out after ninth grade to join the Job Corps. He was thirty-two at the time of his trial. He had a single prior felony conviction, drug related, and had been released from prison for about a year in January 2000. He was unemployed in January 2000 and supporting himself through selling cocaine and marijuana.

The Defendant had known the victim for about a year. About a week prior to the shooting, he had had a fight with the victim. This previous fight was also about the Defendant telling

a man called "JJ" that the victim was "messing with" JJ's girlfriend. The Defendant testified that he had, in fact, told JJ about the victim and JJ's girlfriend "because [he] was telling [his] friend that she was no good and he didn't need to mess with her no more." The victim got wind of the Defendant's conversation with JJ and accosted the Defendant on the steps of the Defendant's apartment. The victim asked the Defendant if the Defendant had told JJ that he was messing with JJ's girlfriend, and the Defendant denied it. Nevertheless, the victim "grabbed" the Defendant "a few times." The Defendant did not fight back because he was smaller than the victim and because the Defendant has a weak knee. The victim "rough[ed][him] up pretty good" before the Defendant was able to leave.

The Defendant testified that he had another fight with the victim on the same topic on the afternoon of the shooting. The Defendant was sitting with his girlfriend in his car. The victim pulled up alongside, stopped his car, and got out. The Defendant rolled down his window to see what the victim wanted. The victim asked the Defendant if he had said anything to JJ about the victim messing with JJ's girlfriend. At this point, the Defendant admitted to having spoken to JJ. The victim then told the Defendant, "I'll [f—] you up. I'll [f—] you up." The Defendant described the victim as "Very mad." The victim reached in the Defendant's window, choked him for a few seconds, and tried to get the Defendant's door open. Because the door was damaged, it would not open. The victim walked over to the passenger side, pulled Ms. Gaither out of the car, and then reached in and pulled out the Defendant. The Defendant testified that he struggled with the victim, but the victim succeeded in pulling him out of the car, anyway. The Defendant testified:

When he pulled me out the car, he spit in my face and then he just kind of like slammed, banged my head up against the car and slammed it against the car. And then he put me up over my door and put me up over the hood. So I was laying up over my door and the hood and he kind of slammed me.

The Defendant testified that he was "very afraid, scared, very nervous, didn't know what to do. Didn't know what to expect, what he was going to do." The attack continued for about two minutes, at which point the victim noticed some people standing around and watching. The victim then left.

The Defendant drove to a friend's house and tried to compose himself. He "couldn't get [him]self together," alternating between sitting down and pacing. He left the house and retrieved his gun from the trunk of his car. The Defendant testified that he got his gun out "for [his] protection and scared that [the victim] might have his gun. And [he] . . . wanted . . . to just make sure [the victim] just won't beat [him] up again in case [he] saw [the victim] again." The Defendant explained that he had seen the victim carrying a Glock 9 millimeter gun "all the time," although he had not seen it on the victim earlier that day. Indeed, the Defendant testified on direct examination that he could not remember the last time he had seen the victim with a gun. The Defendant stated that he put his gun on his side. He then left his friend's house and drove to another friend's apartment, which was in the same complex as the victim's. The Defendant stated that he wanted to talk to the victim to "get this behind us." He did not want the victim "to just pull up on side of me again and do the same thing he did."

When the Defendant initially arrived at the apartment complex where the victim lived, he was still emotional and crying. He described his emotional state as "nervous and scared." He sat in the parking lot for a couple of minutes trying to compose himself, and then put the gun in his pocket and walked to his friend's apartment. By this time, about thirty to forty minutes had elapsed since the victim had beaten him up.

The Defendant walked into his friend's apartment and found several people playing cards. One of them asked the Defendant what was wrong. He responded that he was tired of people putting their hands on him. He paced back and forth a few times between the window and the card table, and then saw the victim drive up. The Defendant walked out of the apartment intending to talk to the victim. As he left, he heard one of his

friends tell him "don't do nothing or don't catch a charge or something like that."

The Defendant got to within about five feet of the victim and asked if he could talk to him. The Defendant had not pulled the gun out at this point. The Defendant testified that the victim's response was "he walked up to me and stepped on my toe, had his foot on my foot. And he grabbed me by the arm like this here. And he toted me like a little kid to the parking lot. And that's when he had jacked me up." As this was going on, the victim's wife was walking toward their apartment.

The victim asked the Defendant what he had in his pockets, and then placed his arm against the Defendant's throat while he patted the Defendant down. The victim pushed the Defendant against a car and slammed the Defendant's head against it. The Defendant struggled but could not get away. The victim then pushed him away and the Defendant turned his back, pulling the gun out of his pocket and firing into the air. The Defendant testified that he shot the gun to keep the victim from beating him up again. At this point, he and the victim were about five feet apart.

The Defendant turned back around to face the victim and saw the victim running at him. The Defendant shot the victim in the leg "[b]ecause [he] didn't want to hurt him and didn't want to kill him." The Defendant continued:

> When I shot him . . . in his leg, he still got up on me and grabbed me by the time I like pushed him away. He stumbled to the-he couldn't get his balance real good. So he stumbled to the parking lot. When he stumbled to the parking lot I backed up. He stumbled away. I say he had to have been like, I say around about 10 feet. He-he fell down and he tried to get up. And he got like halfway up, but he fell back down. And then he got up again and he-I think he fell down again. Then when he went to get back up again-every time he got up, he kind of like tried to get towards

that way where I was. But when he fell down again after he was trying to get up again, I shot back down in his legs [to] [k]eep from him getting at me.

The Defendant stated that the victim was looking at him during this struggle. The Defendant was scared, nervous, very afraid. After firing the final shot, the Defendant ran to his car and left.

The Defendant stated that he did not stand over the victim and fire at him, that he was some distance from the victim while he was shooting. He maintained that, other than when he shot into the air initially, he was at all times aiming at the victim's legs. He did not intend to shoot the victim in the back or chest. He turned himself into the police four or five days later because he "thought that would be the right thing to do," and because he was "very, very sorry that [he] had killed somebody and that [he] had shot a friend of [his]."

The Defendant acknowledged speaking to a police officer before his statement was transcribed, and flatly denied that he told the officer that he had fired shots while standing over the victim.

On cross-examination, the Defendant maintained that the victim was on the ground trying to get up when he shot him. The Defendant denied having shot the victim in the back as the victim tried to run away. The Defendant admitted to having purchased his pistol about a week previously and that it was loaded when he bought it. The Defendant thought it had five bullets in it. He bought it from someone on the street. It was a .38 chrome revolver with a brown handle and a four-inch barrel.

The Defendant also denied having said that he did not want "to catch a murder charge." He steadfastly maintained that he just wanted to talk to the victim. He testified that, when he left the scene, he did not know the victim was dead.

The State called Laquesha Wilson on rebuttal. She testified that the Defendant called her on the telephone about a year prior to the trial. He identified himself and stated that he knew she had seen the victim with a gun before. She told him, "no." According to her, the Defendant then said, "I need someone to say that they seen [the victim] with a gun." She then hung up the phone.

After hearing this proof, the jury determined that the Defendant was guilty of the first degree premeditated murder of Dewayne Williams.

State v. Andre Baldwin, No. W2003-02253-CCA-R3-CD, Shelby County (Tenn. Crim. App. July 21, 2004), app. denied (Tenn. Dec. 6, 2004).

The Petitioner challenged the sufficiency of the evidence on direct appeal, and this court affirmed the conviction. The Petitioner filed a pro se petition for post-conviction relief alleging that trial and appellate counsel did not provide effective assistance, that his conviction was based upon a coerced confession, and that his conviction was based upon knowing use of perjured testimony. Counsel was appointed, and the trial court conducted a hearing on the petition.

At the post-conviction hearing, trial co-counsel testified that he assisted trial counsel at the trial and in the "couple of weeks" before the trial. He said trial counsel was now deceased. He said he and trial counsel were both employed by the public defender's office and were assigned to Division II of the Shelby County Criminal Court. He said they typically worked together "on big cases." He denied that he examined witnesses during the trial and said his trial involvement entailed "taking notes, keeping up with exhibits, and just things of that nature." He said he and trial counsel discussed the case, the facts, and the defense in the two or three weeks before the trial. He said trial counsel "bounced ideas off" him in order to gauge how a jury might react.

Co-counsel testified that he did not recall how the Petitioner was dressed for trial. He said that although the public defender's office had clothing available, it was in poor condition. He said that he thought he spoke to the Petitioner on report dates before the trial but that it was trial counsel's case and trial counsel's job to communicate with the Petitioner. He did not recall communicating with the Petitioner's family or any witnesses before the trial.

-13-

Co-counsel testified that he never questioned the Petitioner's intellect or mental capacity, nor did he recall discussing this with trial counsel. He did not recall whether a suppression motion was filed but stated that his understanding was that the statement was helpful to the Petitioner because it could be used to show self-defense or that the crime had been a lesser included offense of first degree murder.

Co-counsel testified that after reviewing the transcripts, it was his "understanding" that he overheard a conversation between Quinton Williams, who was the victim's brother, and trial counsel. He said Mr. Williams had been complimentary of the way trial counsel handled the case. He said Mr. Williams said "something about the victim having a gun or used to carry a gun or had carried a gun." He said this began trial counsel's lengthy attempt to obtain a new trial for the Petitioner. He said that he had not been a party to any pretrial discussions of whether the victim carried a gun but that he thought trial counsel tried to make that point during the trial. He said that he did not think trial counsel spoke with Mr. Williams before the trial because trial counsel's conversation with Mr. Williams was pursued as newly discovered evidence.

Co-counsel testified that he would have answered any questions the Petitioner asked him during the trial in order to allow trial counsel to focus on the court proceedings. He said he had no notes reflecting that the Petitioner asked him specific questions but that he would have tried to answer any questions.

Co-counsel testified that the public defender's office employed investigators. He said there were at least two investigators who were involved in the Petitioner's case. He also identified a law clerk who worked on the case and had since moved to the Virgin Islands. He said she testified in earlier proceedings. He said the defense theory was that the victim was a bully, that the Petitioner and the victim had an earlier physical altercation in which the Petitioner was badly beaten, and that the Petitioner later killed the victim in self-defense or in a manner of homicide that was less culpable than first degree murder.

Co-counsel testified that he did not know if trial counsel and the Petitioner decided before the trial whether the Petitioner would testify. He said that in many other cases he tried with trial counsel, the decision was not made until after the State rested its case. He said that although he was not involved in the decision, he doubted that trial counsel would have made a final decision on the issue before the trial. He did not recall preparing the Petitioner to testify but said this would have been trial counsel's role, not his. He said he did not have any specific recollection of spending time with the Petitioner or trial counsel in a holding area during the trial. He said he and trial counsel would have talked to the Petitioner during breaks and before and after court every day. He said that even though he did not have any memory of it, he was certain this was done in the Petitioner's case. Co-counsel said that it

was not his standard practice to play the role of the prosecutor in a mock cross-examination of the Petitioner and that he did not do so in this case. He said he was sure that trial counsel discussed the Petitioner's testimony with the Petitioner.

On cross-examination, co-counsel testified that he thought trial counsel decided not to suppress the Petitioner's statement as a matter of strategy. He said the statement was favorable to the Petitioner because it explained why the shooting took place, although he acknowledged that the Petitioner did not say in the statement that the victim had a gun. He recalled that there was only one eyewitness to the shooting but that there were three to five other witnesses who were near the scene, in addition to the police officers who testified.

Co-counsel testified that he did not think trial counsel spoke with Quinton Williams, the victim's brother, before the trial. He did not think trial counsel had any reason to believe that Mr. Williams would have testified favorably for the Petitioner. He said there were several continuances of the motion for a new trial and sentencing hearing while trial counsel pursued evidence of the victim's having a gun. He said trial counsel attempted to have Mr. Williams repeat the statement he made after the verdict in order to show that the victim had a reputation for carrying a gun. He said he was not involved in the case after the trial but was aware of the events from being in the courtroom when the post-trial proceedings took place.

Co-counsel testified that he had a large volume of documents in trial counsel's handwriting that reflected the work trial counsel performed in the Petitioner's case. He said he was sure trial counsel did everything he could to help the Petitioner.

On examination by the court, co-counsel testified that trial counsel was employed by the public defender's office for twenty-five to thirty years and died in his mid-to-late fifties. Co-counsel said he was employed by the public defender's office for about seven years and had been the Division Two supervisor for about two years before he acted as co-counsel in the present case.

Co-counsel testified that trial counsel was very thorough and effective as a trial attorney. He said that even though he supervised trial counsel, he considered trial counsel a mentor because of trial counsel's years of experience. He said that trial counsel was very concerned about the Petitioner and worked diligently, although unsuccessfully, to obtain a new trial for the Petitioner after the victim's brother made the statement about the victim's carrying a gun. He said he never knew trial counsel to be unprepared for a trial. He reaffirmed that he did not remember meeting the Petitioner at the jail before the trial and that he and trial counsel worked as "another set of hands and ears and eyes just to help each other out" when the other was lead counsel in a trial.

On redirect examination, co-counsel testified that the Petitioner and the victim "had some pretty mighty confrontations" and said he would defer to the Petitioner on whether the Petitioner and the victim were "friends." He said the Petitioner and the victim knew many of the same people who were witnesses to the events surrounding the shooting. He said the witnesses who testified had been inside the victim's apartment.

Jessie Baldwin, the Petitioner's father, recalled that he previously testified about a conversation he had with Quinton Williams in the hallway during jury deliberations. He said Mr. Williams told him that the victim usually had a gun and that Mr. Williams "brought the gun to his brother." He agreed that Mr. Williams claimed to be unable to own a gun because Mr. Williams was on probation. He said that he told trial counsel and that trial counsel "was going to look into it."

Mr. Baldwin testified that to his knowledge, the Petitioner and the victim were friends, had several mutual acquaintances, and sold drugs in the same apartment complex. He said that the Petitioner lived with two other men in an apartment and that the victim went to the apartment complex to sell drugs.

Mr. Baldwin testified that the Petitioner came into his custody when the Petitioner was nine years old and went to live with his sister, the Petitioner's aunt, when the Petitioner was about fourteen. He said that the Petitioner's mother passed away about five years before the crime and that she had suffered from paranoid schizophrenia. He said the Petitioner dropped out of the ninth grade. He said that the Petitioner's grades were always poor but that the Petitioner was never in any special education classes. He said that to his knowledge, the Petitioner never had any IQ testing.

Mr. Baldwin testified that to his knowledge, the public defender's office never contacted any family members during the prosecution. He acknowledged that he contacted and spoke with trial counsel "maybe once" before the trial and that after the conversation with the victim's brother, he related it to trial counsel. He later testified that he had two conversations with trial counsel before the trial, one in person and one by telephone. He said he had no idea what the defense theory of the case was. He said that trial counsel asked him to bring Tameka Ginker, the Petitioner's girlfriend at the time of the crime, to testify, but that no one contacted the mother of the Petitioner's child. He said that there was a man whom trial counsel wanted to interview but that he did not know whether trial counsel ever did so. He said that at the trial, the Petitioner "was dressed like he is now" and that no one ever asked the family to provide clothing for the trial. He said that the State "overprosecuted" the case and that there was never any evidence presented about the Petitioner's character.

The Petitioner testified that he met with trial counsel about five times in the nine months before the trial. He said three of these visits were on the last three days before the trial. He said that trial counsel knew he wanted to testify but that counsel never prepared him for his testimony. He said he reviewed discovery materials in his jail cell before he testified. He said he and trial counsel discussed the type of person the victim was and admitted they discussed the victim and his "mutual occupation." He said that he and trial counsel discussed having clothing for him to wear at the trial "maybe once" about three months beforehand. He said counsel assured him that he would have clothing when the time came. He said he wore a jail uniform every day at the trial.

The Petitioner acknowledged that on the fourth day of the trial, trial counsel requested and the trial court granted a recess of about an hour in order for trial counsel to prepare him to testify. He said trial counsel prepared him "maybe a little" for cross-examination but denied that trial counsel played the role of the prosecutor and asked him hard questions.

The Petitioner testified that until a hearing began on the admissibility of his prior conviction for felony drug possession, he was unaware the conviction might be used to impeach his testimony. He said the hearing on his prior conviction took place before the recess in which trial counsel prepared him to testify but claimed trial counsel did not explain what transpired in the hearing. He said he did not know that his prior conviction might be used for impeachment when he first expressed his desire to testify to the court.

The Petitioner estimated that his pretrial meetings with trial counsel were only about twenty minutes long, although he said he could not remember. He said that he noticed the evidence regarding the crime scene was inaccurate and that he tried to explain the discrepancies to trial counsel, but that trial counsel did not raise the issue at trial. He acknowledged that he did not testify about the crime scene inaccuracies during his trial testimony.

The Petitioner testified that "way before the trial" he gave trial counsel the names of people who knew both the victim and him. He said that he gave trial counsel the names of people who had seen the victim carrying a gun but that none of these witnesses testified. He said trial counsel claimed he could not find these witnesses. He said the witnesses lived in the neighborhood where the crime occurred and acknowledged that they had criminal records. He said that he did not give the name of his child's mother to trial counsel and that she did not try to assist in the defense. He said that that one of the names he gave trial counsel was Edward Dye and acknowledged that Mr. Dye testified at the motion for new trial hearing about having seen the victim with a gun on numerous occasions. He said trial counsel had no trouble finding Mr. Dye after the trial.

The Petitioner testified that he had seen co-counsel before the trial but did not meet him until the first day of the trial. He said co-counsel was not present when he and trial counsel discussed his testimony. He said co-counsel "was just there" but did not do anything. He said trial counsel "did mostly everything else."

The Petitioner testified that trial counsel did not present evidence that helped him or offer expert witnesses. He said he knew the victim had prior arrests but did not understand why that evidence was not presented.

The Petitioner denied that he underwent a mental evaluation before the trial. He said that trial counsel never mentioned it and that he did not know he needed one. He said he was never in special education classes in school but stated he failed first grade, third grade, seventh grade two times, and ninth grade before dropping out of school. He said he could read "a little bit" but did not understand many of the words in his pleadings. He agreed that he and his post-conviction attorney had communication difficulties during three or four discussions and that he had memory problems. He said that he "tried to" discuss these matters with trial counsel and that he discussed it with the attorney who represented him in general sessions court. He denied ever speaking to the two investigators that co-counsel identified as having worked on the case.

The Petitioner acknowledged meeting with a law clerk after the trial. He thought they discussed the statement the victim's brother made about the victim's carrying a weapon.

The Petitioner testified that trial counsel came to see him after the trial and acknowledged that counsel wanted to make sure he was not going to commit suicide. He said trial counsel said "off the wall stuff," such as his desire to obtain a verdict of second degree murder.

The Petitioner disavowed the allegations in his petition that the police beat him and held a gun to his head. He agreed this never happened and said another inmate helped him draft the petition.

The Petitioner testified that although his main issue was with trial counsel, he was also dissatisfied with appellate counsel's representation. He said appellate counsel failed to communicate with him other than writing him a letter stating that she was representing him on appeal. He said she did not send him a copy of the brief until after it was submitted to the court. He said he had another inmate write a letter he sent to appellate counsel.

On cross-examination, the Petitioner said he had always wanted to testify. When asked whether he listened at the hearing in which his prior conviction was ruled admissible

and afterwards decided to testify, he said, "I'm such a slow learner I still gave it up anyway when I sat down on here and I gave up what I saw."

The Petitioner testified that "somebody had to move" the car and other objects at the crime scene because they were not in the proper locations. He said that bullet holes were found down the street but that everything happened in front of the apartments. He acknowledged that the victim was shot in the leg and back but kept getting up.

The Petitioner acknowledged that Quinton Williams testified at the hearing on the motion for new trial but that Mr. Williams did not say what the Petitioner wanted him to say. He said Edward Dye was the only other witness at the hearing. He admitted he did not testify at the trial about the victim's having a gun.

The trial court received a report from the Memphis City Schools Mental Health Center regarding the Petitioner. The quality of the report was poor due to its having been copied from microfiche. Although it is not entirely legible, it appears to have been prepared when the Petitioner was 9.9 years old and in the third grade. The Petitioner was referred for evaluation due to "low school achievement," and he was diagnosed with "Specific Learning Disturbance. Mild." His Verbal IQ was eighty-four, his Performance IQ was eighty-five, and his Full Scale IQ was eighty-one. His grade level scores on achievement testing were 2.2 for Word Recognition, 2.0 for Spelling, and 3.2 for Arithmetic.

Appellate counsel, an employee of the public defender's office, testified that she did not participate in any of the proceedings in the trial court, including the motion for new trial. She said that in cases other than capital cases, the appellate attorneys were not involved until after a notice of appeal was filed unless a trial attorney solicited earlier participation. She said that she did not specifically recall discussing the Petitioner's case with trial counsel but that she would have reviewed and "annotated" the transcripts of the trial. She was aware trial counsel was "really involved emotionally" in the Petitioner's case. She said that she thought there was a legal basis for the verdict but that it was unfair "from a humanistic viewpoint."

Appellate counsel testified that she had no notes from the Petitioner's appeal because they were destroyed in a flood. She said the typical practice once an appellate attorney was assigned to a case was for a secretary from her office to send a form letter explaining the appellate process to the defendant. She said that the attorney would respond to any letters a defendant wrote and that they accepted collect calls. She said that after the brief was prepared, another letter was sent to the defendant and that copies of the motion for new trial, appellate brief, and the trial transcripts were enclosed. She said that after the court of criminal appeals filed its opinion, a letter was sent that explained whether the appellate attorney would attempt to have the supreme court review the case, or if the attorney were

withdrawing, the letter followed the dictates of Tennessee Supreme Court Rule 14. She said a copy of the court's opinion was enclosed with the letter.

Appellate counsel testified that trial counsel did a good job with the case he had. She said, "[T]here wasn't a lot to work with." She said he was passionate about the case and wanted a good result for the Petitioner. She said he was vigorous in his pursuit of a new trial based upon newly discovered evidence.

Appellate counsel testified that in her opinion, the evidence that the victim was known to have a gun did not qualify as newly discovered evidence that would form the basis for a new trial. She noted that there was proof at the trial that the victim and his associates were violent and liked to "beat up" the Petitioner and others. She said that with respect to the appeal, "You weaken good arguments with bad arguments." She said the best appellate issue in the Petitioner's case was a challenge to the sufficiency of the evidence. She said the facts of the Petitioner's case made it one of the most sympathetic she had seen. She said she chose to pursue this "solid" issue and not to raise the issue of newly discovered evidence because she did not think the latter had merit. She noted that the witnesses' testimony at the hearing on the motion for new trial was not as favorable to the Petitioner as what the witnesses had said previously. She also noted that there was no witness who could say that the victim was armed on the day he was killed.

On cross-examination, appellate counsel testified that she did nothing but appeals for a decade and had other practice experience, as well. She said that the appellate attorneys responded to letters from defendants within twenty-four hours. On redirect examination, appellate counsel testified that she typically did not request oral argument because it was not appropriate in most cases. She said she orally argued fifteen to twenty times in approximately 250 appeals. She said that an issue of sufficiency of the evidence was fact-intensive and was more persuasively argued in writing. She said oral argument was appropriate for cases involving questions of law. She said that if a case like the Petitioner's were orally argued, "you just let the State shoot you to shreds."

Appellate counsel testified that she felt sorry for the Petitioner. She said she understood why he killed the victim and thought anyone else would have acted in the same manner had he or she been in the situation.

David Zak testified that he was the lead prosecutor at the Petitioner's trial after taking the case over from another prosecutor who was leaving the district attorney's office. He said that he worked with trial counsel in Division Two for about three months before the Petitioner's trial and that he worked with him for two or three years afterwards.

Mr. Zak testified that he had many conversations with trial counsel about the Petitioner's case. He described trial counsel as a "bulldog" and said trial counsel did a good job in the Petitioner's case. He said trial counsel challenged the State's witnesses when the opportunity arose. He said that trial counsel was able to demonstrate inconsistencies in the witnesses' testimony about the shooting but that trial counsel was unable to overcome the State's proof that the victim was shot in the back. He said that the facts might appear to be sympathetic but that the Petitioner "didn't come off as sympathetic to the jury." He also noted the proof that the Petitioner had been shamed by the beating from the victim and that the Petitioner made statements before the crime that he was going to kill the victim. He said there was no proof the victim had a gun on the day of the shooting.

Mr. Zak testified that at the hearing on the motion for a new trial, trial counsel attempted to present proof that the victim had a gun but that the witnesses who testified denied making any statements about the victim's having a gun. He said that on cross-examination, the witnesses contradicted their direct examination testimony. He said, "[Y]ou can't start a fight and claim self-defense. And that's what happened here." He agreed with appellate counsel's assessment that the proof did not qualify as newly discovered evidence to support the grant of a new trial. He said the jury's verdict was a product of the proof in the case, not of trial counsel's having been ineffective.

On cross-examination, Mr. Zak testified that there was no ballistics testing done on the shell that was recovered because the murder weapon was never recovered. He said the State's theory was that the Petitioner shot the victim in the leg before the shot to the back. He thought the Petitioner testified that the victim charged him.

Mr. Zak could not recall whether trial counsel approached him about a plea agreement. He did not specifically remember going through the file with trial counsel, but he said he had done this with trial counsel on other cases. He also did not recall meeting with or reviewing the notes of any investigators, although he recalled that the public defender's law clerk worked on the case. He remembered talking to trial counsel about the facts involving "five people at a card game." He said trial counsel told him more than once that the victim started fights and beat the Petitioner and that the Petitioner had been scared of the victim. He said the proof supported claims that the victim had been beating the Petitioner. He acknowledged that the Petitioner's only trial evidence was his testimony and the testimony of Tameka Gaither. He said he thought that in addition to Ms. Gaither, there was one other witness who testified about the victim's beating the Petitioner. He said, however, he did not think this had been a disputed fact at the trial.

Mr. Zak described Quinton Williams as an "angry young man." He said Mr. Williams was not cooperative with either him or trial counsel.

On redirect examination, Mr. Zak testified that he never saw any indication that the Petitioner needed a mental evaluation. He said an evaluation would have been pointless and noted that evidence of the Petitioner's mental health was not consistent with the defense theory. On recross-examination, he acknowledged that aside from cross-examination, he only spoke with the Petitioner once. He said he asked for a mental evaluation when there was "a scintilla of proof" that a defendant had a mental health issue. He acknowledged never reviewing the Petitioner's school records.

The trial court received as an exhibit the transcript of the post-trial hearing at which trial counsel presented the newly discovered evidence witnesses. The record reflects that the Petitioner agreed with the State to submit only this transcript, rather than the transcripts of the entire conviction proceedings as proof. We note that the judge for the post-conviction hearing was not the trial judge.

The transcript of the post-trial hearing reflects that Quinton Williams testified that he spoke with the Petitioner's father for a few minutes after the trial. He said they discussed that he lost a brother and the Petitioner's father lost a son. He admitted telling trial counsel that he had not thought the verdict would be a finding of guilt for first degree murder but denied saying that he thought first degree murder was too serious a conviction for the crime. He admitted he had said to trial counsel that he did not own a gun because he was on probation. He then said he did not have a gun in his possession while he was on probation and admitted he was on probation when the victim was killed. He did not remember saying in a telephone conversation with the public defender's law clerk that he thought the verdict was too harsh. He acknowledged speaking with the clerk and said that after she asked him to be a defense witness, he told her he had nothing constructive to say on the Petitioner's behalf. He admitted that he said he was not going to hurt his mother by testifying for the defense and that he also told the law clerk to tell trial counsel that if he were subpoenaed, he would not say anything in his testimony to help the defense. He denied the victim borrowed a gun from him and said that to his knowledge, the victim never carried a gun.

On cross-examination, Mr. Williams said he was not difficult to find by someone who was looking for him. He affirmed that he did not own or possess a weapon in the year the victim was killed, that he never gave the victim a weapon, and that he never knew his brother to carry a weapon. He agreed that the victim and the Petitioner had arguments and that the victim beat up the Petitioner on the day of the victim's death.

Jesse Baldwin testified at the post-trial hearing that he and Mr. Williams spoke before the verdict was returned. He said they discussed "general stuff" about the case and the trial evidence, including a female witness who testified about the gun. He said that Mr. Williams did not believe the Petitioner asked the female witness to lie about the gun, that Mr. Williams

said the gun was his, and that Mr. Williams claimed he loaned the gun to the victim from time to time. He said that he spoke with Mr. Williams again after the verdict was returned and that Mr. Williams said the Petitioner "had his opportunity but he chose the jury trial and this was the result of it." He said that he spoke to the Petitioner every day during the trial and that he reported his conversations with Mr. Williams to the Petitioner. On cross-examination, Mr. Baldwin testified that the Petitioner did not really know before the trial how trial counsel would present his case. He said he did not talk to trial counsel until the trial.

Edward Dye testified that he knew the victim, the Petitioner, and Quinton Williams. He acknowledged he had been the victim's friend. He said that he did not see what happened when the victim was shot but that he saw part of the fight beforehand. He said the victim won the fight. He admitted that he had fought with the Petitioner over money in the past and that he won that fight. He said that to his knowledge, the Petitioner did not pick fights. He described the victim as a "quiet person." He acknowledged that he knew the victim to carry a gun on occasion and said it was a black nine millimeter. He said he did not see the victim with a gun on the day of the crime. He said he had been difficult for trial counsel to locate because he did not want to be involved in the case. He admitted he told the Petitioner he did not know anything and did not want to be involved.

On cross-examination, Mr. Dye testified that he spoke to the Petitioner the day after the crime and that the Petitioner called him a few times after the Petitioner's arrest. He denied that the Petitioner ever said his attorney might contact Mr. Dye. He said that he lived in town and worked at the same job as on the day of the crime but denied that he still associated with the same people. He said someone could find him if he or she needed to. On redirect examination, he clarified that he had seen the victim carry a gun in his hand or pocket.

Tonya Saffir testified that she was a law clerk for the public defender's office. She said that at trial counsel's request, she tried several times to reach Quinton Williams by telephone. She said Mr. Williams told her that he would not be able to testify for the defense because it would hurt his mother if he did so. She said he stated that if trial counsel subpoenaed him, he would not say anything favorable. On cross-examination, Ms. Saffir testified that she did not work on the Petitioner's case until after the trial. She said that she was a part-time employee and that it took her "not quite a week" to find Mr. Dye.

Co-counsel testified at the post-trial hearing that after the verdict was returned, he overheard a conversation between trial counsel and Quinton Williams. He said Mr. Williams complimented trial counsel's handling of the case and said something to the effect that he thought the verdict should have been for a lesser offense. He said the jury foreman and an

employee of the probation company were also present during the conversation. On cross-examination, co-counsel testified that he worked on the Petitioner's case beginning a week or two before the trial. He said that although his involvement was minimal, he and trial counsel discussed strategy and witnesses.

After receiving the proof at the post-conviction hearing, the trial court denied relief. The court found that the Petitioner failed to establish any of his claims by clear and convincing evidence. This appeal followed.

On appeal, the Petitioner contends that the trial court erred in denying his claims that trial counsel was ineffective (1) in investigating the case and preparing for trial and (2) in communicating with him and preparing him to testify. The State contends that the trial court did not err in finding that the Petitioner failed to prove his claim. We agree with the State.

The burden in a post-conviction proceeding is on the petitioner to prove his grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2010). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457. Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103 (2010).

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is on the Petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). In other words, a showing that counsel's performance fell below a reasonable standard is not enough because the Petitioner must also show that but for the substandard performance, "the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. Henley v. State, 960 S.W.2d 572, 580 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to show that the counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability means a "probability sufficient to undermine confidence in the outcome." Id.

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were "within the range of competence demanded of attorneys in criminal cases." Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). Baxter, 523 S.W.2d at 936. Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689; see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance. Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. See DeCoster, 487 F.2d at 1201; Hellard, 629 S.W.2d at 9.

### I - Ineffective Assistance Before the Trial

#### A.     Communication with Witnesses and Others

The Petitioner argues in his brief, "Every single witness who testified at the post-conviction hearing testified that they did not communicate with [trial counsel] about the case." This statement is factually incorrect. Both the Petitioner and his father testified about communication with trial counsel before the trial. Co-counsel testified about the days he spent preparing for the trial with trial counsel. Mr. Zak testified that he spoke with trial counsel about the case before the trial. In addition, co-counsel and appellate counsel testified that trial counsel was a conscientious attorney and that he took a particular interest in the Petitioner's case and pursued it vigorously. The trial court did not err in denying relief on this basis.

#### B.     Failure to Provide Clothing for the Trial

The Petitioner also argues that trial counsel failed to provide him with clothing for the trial. The Petitioner presented proof that he and trial counsel discussed his trial attire in the early stages of trial counsel's representation and that even though the Petitioner anticipated that trial counsel would provide clothing, none was provided.

The Supreme Court has said that in accord with the Fourteenth Amendment, a defendant should not be compelled by the State to wear prison clothing at his trial. See Estelle v. Williams, 425 U.S. 501, 504 (1976). A defendant, may, however, choose to appear in prison clothing as a matter of trial strategy. See id. at 512-13; State v. Zonge, 973 S.W.2d 250, 257 (Tenn. Crim. App. 1997). A defendant's Fourteenth Amendment right to be free from a State-compelled appearance in prison clothing is not violated if the defendant has a reasonable opportunity to wear street clothing but does not do so. Zonge, 973 S.W.2d at 257.

We note that the Petitioner has not alleged that he was compelled by the State to wear his jail uniform, but rather, that his counsel was ineffective in communicating with him about providing regular clothing and in not providing regular clothing for the Petitioner to wear at the trial. Thus, the issue is whether trial counsel's performance was deficient, and if so, whether the deficient performance prejudiced the Petitioner.

The Petitioner's proof demonstrated that he and trial counsel discussed his trial attire and that although the Petitioner thought trial counsel was providing him with clothing, the Petitioner wore his jail uniform at the trial. The Petitioner's proof did not address whether trial counsel disregarded the Petitioner's request for regular clothing. There was no proof addressing why the Petitioner did not raise the issue with trial counsel when no clothing was provided, nor did he show that he requested clothing at the trial but was denied clothing by counsel. The record is likewise silent on the issue of whether trial counsel believed at the time of the trial that there was an advantage to the Petitioner's wearing jail clothing. The record reflects that the defense appealed to the jury's sympathy for the Petitioner. Upon review, we conclude that the Petitioner failed to establish clear and convincing evidence of trial counsel's deficient performance by not providing regular clothing for the trial.

The Petitioner also has not shown that there was a reasonable probability that the outcome of the trial was affected. The Petitioner admitted that he shot the victim. The only questions were whether he did so in self-defense and if not, whether the offense was first degree murder or a lesser included offense. Given this factual scenario, we conclude that the Petitioner failed to present clear and convincing proof that trial counsel's allowing the Petitioner to appear before the jury in a jail uniform was prejudicial. The Petitioner is not entitled to relief on this basis.

## C. Failure to Call Edward Dye as a Trial Witness

The Petitioner complains that trial counsel failed to investigate Edward Dye and call him as a witness at the trial. Mr. Dye testified at the post-trial hearing that he had been difficult for trial counsel to find because he did not want to be involved in the case. He later

admitted that he had been living in the same neighborhood and working at the same job since the crime and that he could have been found. Mr. Dye testified that he talked to the Petitioner a few times after the crime and advised the Petitioner that he knew nothing and did not wish to be involved. He admitted that he saw the victim with a gun at times but denied that he saw the victim with a gun on the day of the crime.

Upon review, we hold that the trial court did not err in denying relief on this basis. The record reflects that although the Petitioner testified that he told trial counsel about Mr. Dye and that trial counsel did not call Mr. Dye as a witness at the trial, trial counsel presented proof at the trial that the victim was a bully and had beaten the Petitioner repeatedly, including on the day of the crime. See Andre Baldwin, slip op. at 5-8. Trial counsel also presented proof that the Petitioner was afraid of the victim. See id. Mr. Dye's testimony that the victim was sometimes armed would have been corroborative of proof already before the jury. We note, as well, that the State presented proof at the Petitioner's trial that before the trial, the Petitioner solicited Laquesha Williams to testify that she saw the victim with a gun. When she denied that she saw this, the Petitioner said, "I need someone to say they seen [the victim] with a gun." Id., slip op. at 8. Taken together with the proof that trial counsel was thorough and well prepared for both the Petitioner's evidence and cross-examination of the State's witnesses, we conclude that the Petitioner did not show that trial counsel's performance was deficient or that it was more probable than not that Mr. Dye's trial testimony would have had a favorable effect on the outcome of the case.

**D.     Failure of the State to Offer Proof of Trial Counsel's Pretrial Preparation**

The Petitioner also argues that he was entitled to relief based upon the State's inability to produce a record of trial counsel's pretrial preparation, even though there was proof that the public defender's file was destroyed by a flood. We note that the Petitioner, not the State, had the burden of proof at the post-conviction hearing. See T.C.A. § 40-30-110(f). The State's inability to produce the file is of no consequence where, as here, the Petitioner's proof was unavailing and the State presented other evidence that trial counsel was prepared for trial.

Having rejected each of the Petitioner's claims regarding counsel's pretrial investigation and preparation, we conclude that the trial court did not err in denying relief. He is not entitled to appellate relief on this basis.

**II - Ineffective Assistance Due to Failure to Communicate with the Petitioner**

The Petitioner argues that trial counsel failed to communicate with him. He notes the proof of his low intelligence and argues that trial counsel had a heightened responsibility to

protect him. He argues that he was inadequately prepared to testify at trial. The Petitioner's proof of his alleged low intellect consisted of a single report prepared in 1979 by the school system when the Petitioner was 9.9 years old and testimony about his poor academic performance. The report contains a diagnosis of a mild learning disturbance, reflects IQ scores in the low to mid eighties, and notes achievement test scores at or below grade level. The Petitioner and his father testified that he was a poor student, and the Petitioner said he dropped out of school in the ninth grade after being retained in several grades. The Petitioner offered no proof, though, of any mental impairment that would affect his ability to communicate with and understand trial counsel, nor does the post-conviction record reflect that he sought but was denied access to expert witnesses to demonstrate a deficiency in this regard. Co-counsel and the prosecutor testified that they had no indication of the Petitioner's having any mental impairment. Although post-conviction counsel argues in his brief that he "noted that an issue of [the Petitioner's] capacity was readily apparent," his contention is not supported by the proof. The evidence supports a contrary conclusion.

Aside from any question of the Petitioner's mental capacity affecting his communication with counsel, we have noted that the record contains proof that trial counsel met with the Petitioner at least five times before trial, including the three days before the trial. The Petitioner testified that trial counsel knew of his desire to testify and that trial counsel requested and the trial court granted a recess of approximately one hour for trial counsel to prepare the Petitioner to testify. The trial court did not err by finding that the Petitioner failed to show that counsel's performance was deficient or that he was prejudiced by any deficient performance in counsel's communications with him.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE